IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| GARON C. HANSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACT. NO. 3:11-cv-1073-CSC |
| | )                  (WO) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.  Introduction**

On January 7, 2009, the plaintiff, Garon C. Hanson, protectively filed a Title II application for a period of disability and disability benefits and a title XVI application for supplemental security income.  (R. 13, 103, 108).  Hanson alleges disability beginning July 25, 2008.  (R. 13, 103, 108).  After the claims were initially denied, Hanson requested and, on November 6, 2009, received a hearing before an administrative law judge ("ALJ").  (R. 28).  Following the hearing, ALJ Earl C. Cates, Jr., denied the claim on January 14, 2010. (R. 21).  On October 14, 2011, the Appeals Council rejected a subsequent request for review.  (R. 1).  The ALJ's decision consequently became the final decision of the Commissioner of Social

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

Security ("Commissioner").[2]  *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and remanded.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

---

[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 20 CFR §§ 404.1508; 20 CFR § 416.908.

> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No

---

[4]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.** Hanson was born on September 9, 1980.  (R. 31).  He was 29 years old on the date the ALJ issued an opinion in this case.  (R. 31).  He completed two years of college without a major.  (R. 34).  His past employment history includes work as a police officer, camp counselor for mentally handicapped children, day care worker, embroidery shop store associate, bookstore associate, telephone operator, data entry worker, textile worker, forklift operator, cook, substitute school teacher, and carpenter.  (R. 36-41).  Hanson alleges that he is disabled due to epilepsy and a history of removal of a brain mass, as well as depression that occurs as a side effect of his anti-seizure medication.  (R. 42, 63).

**B.    The Findings of the ALJ**

The ALJ found that Hanson met the insured status requirements of the Social Security Act through June 30, 2013.  Further, the ALJ found that Hanson's epilepsy and history of removal of a brain mass constitute severe impairments. (R. 15).  The ALJ found that Hanson suffers from depression as a side effect of his anti-seizure medication, but that the effects of depression are so minimal that his depression is not

a severe impairment. (R. 16-17).

The ALJ concluded that Hanson does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17).

The ALJ determined that Hanson

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he has no physical restrictions but should avoid unprotected heights or working around dangerous, moving machinery.

(R. 13).

The ALJ found that Hanson "is capable of performing past relevant work as a camp counselor (DOT 159.124-010), telephone operator (DOT # 235.662-022), data entry clerk (DOT # 203.582-054), salesperson (DOT# 277.257-034) and teacher's aide (substitute teacher) (DOT 249.367-074)." (R. 20). Therefore, the ALJ concluded that Hanson is not disabled. (R. 20).

**C.   Issues.**

Hanson presents the following issues for review:

1.  Whether the ALJ erred as a matter of law by failing to find Hanson's depression was a severe impairment when making the overall disability determination; and

2.  Whether the ALJ erred as a matter of law in failing to pose questions to the vocational expert that accounted for functional limitations caused by Hanson's depression.

(Doc. 11 p. 4).

## IV. Discussion

**A. The ALJ erred at step two of the sequential evaluation process by disregarding the opinion of Hanson's treating physician without good cause and by failing to find that Hanson's depression was a severe impairment.**

At the second step of the analytical process, the ALJ must determine whether the claimant has a severe impairment. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "[A] 'severe impairment' [is] defined as 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (quoting 20 C.F.R. § 404.1520(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs." 20 CFR § 404.1521. An impairment can be considered as "not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *McDaniel*, 800 F.2d at 1031; see also *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). To satisfy the "mild" burden to demonstrate a severe impairment at step two, the claimant "need show only that [his] impairment is not so slight and its effect is not so minimal." *McDaniel*, 800 F.2d at 1031. The step two severity analysis is a threshold inquiry that allows only "claims based on the most trivial impairment to be rejected." *McDaniel*, 800 F.2d at

1031.

As the ALJ recognized, the medical record establishes that Hanson has suffered from two kinds of partial focal seizures. (R. 346, 460). The first type of seizure began occurring in approximately 2000 and ceased on August 4, 2008, the day Hanson underwent surgery to remove a brain mass. (R. 42, 346). The second type of seizure began occurring in September, 2008, one month after his brain surgery. (R. 346). After Hanson's surgery, he was treated with several different anti-seizure medications, but the second type of seizure continued to occur approximately once per week until he began taking Keppra on July 1, 2009. (R. 52, 59-61, 460). He has not had a seizure while taking Keppra.[5]  (R. 52).

However, at the administrative hearing, Hanson testified[6] that Keppra made him "feel worthless" and that, "if it wasn't for [his] wife and the church, [he] probably would have killed [him]self." (R. 62). He testified that his depression caused "just total feelings of worthlessness and just not want to even nothing, shower, brush [his] teeth, nothing. [He] can just sit there for an hour just staring at the wall and just feeling sorry for [him]self." (R. 63-64). Hanson does not want to take Keppra

---

[5] Although the ALJ found that Hanson has not had a seizure since July 1, 2009 when he began taking Keppra, the medical records confirm that Hanson's last seizure occurred in early July, 2009, when he was taken off his seizure medication briefly for seizure monitoring. (R. 18, 52, 364, 367-69, 460).

[6] Although Hanson is compliant with his medication (R. 461-62), Hanson did skip taking Keppra on November 6, 2009, the day of the administrative hearing, so that the side effects would not interfere with his testimony. (R. 65).

7

because he finds the depression unbearable, although he is compliant with his prescription. (R. 64). Hanson's wife testified that, although Keppra has effectively stopped Hanson's seizures, Keppra "totally changes his personality" by causing him to be "extremely depressed and apathetic, lethargic," and "antisocial." (R. 52-53, 56). According to Mrs. Hanson, her husband is naturally very social and a "huge talker," but, when he takes Keppra, he is no longer talkative, "doesn't want to go anywhere" or engage in social interaction, and "the things he used to enjoy doing, he doesn't do." (R. 53).

On July 7, 2009, shortly after he began taking Keppra, Hanson was admitted to the Seizure Monitoring Unit of the hospital at the University of Alabama, Birmingham, ("UAB") for continuous monitoring and a "definitive diagnosis." (R. 346-47). He reported that his last seizure had occurred two weeks prior to admission. (R. 346). He listed his medications as Lamictal and Keppra. (R. 346). It was noted that he had previously tried another antiepileptic medication, Trileptal, but Trileptal was discontinued due to side effects including visual disturbance, blurry vision, dizziness, increased fatigue, and problems with coordination. (R. 346). Hanson reported that he recently had a problem with depression, fatigue, and difficulty sleeping. (R. 358). Hanson reported that, in the past four weeks, he always or often had a problem with depression and disturbed sleep, and that he sometimes had a

problem with unsteadiness, tiredness, nervousness and/or agitation, double or blurred vision, sleepiness, and memory problems. (R. 355). In completing a depression rating scale, Hanson reported that, in the past week, "most or all of the time (5-7 days)" he felt that he "could not shake off the blues" even with help from his family and friends, he did not feel like eating, and his appetite was poor. (R. 357). Hanson reported that, in the last week, "occasionally or a moderate amount of the time (3-4-days)," he felt that everything he did was an effort and he talked less than usual. (R. 357). Hanson also reported that the following occurred "some or a little of the time (1-2 days)" in the last week: "I was bothered by things that usually don't bother me; I felt hopeless about the future; I thought my life had been a failure; I felt fearful; my sleep was restless; [and] I could not 'get going.'" (R. 357). He reported that "rarely or none of the time (<1 day) "I was unhappy;" "I felt lonely;" "people were unfriendly;" "I did not enjoy life;" "I had crying spells;" "I felt sad;" "I felt that people disliked me." (R. 357). Hanson's initial discharge instructions included the continuation of all home medications including Keppra and Lamictal, and a plan to follow up with his treating neurologist, Dr. Robert C. Knowlton, in three months. (R. 348, 349).

In October 2009, approximately three weeks before the administrative hearing, Hanson and his wife complained to his treating physician that he was suffering from

9

debilitating depression as a side effect of taking Keppra, and he was prescribed an antidepressant. (R. 53, 63).

On October 21, 2009, Dr. Robert C. Knowlton, one of Hanson's treating neurologists at the Epilepsy Center at the University of Alabama, Birmingham, answered questions on a form concerning his patient's seizures. (R. 460-63). Dr. Knowlton stated that Hanson suffered complex partial seizures, and he diagnosed "intractable epilepsy and depression secondary to seizure medication adverse effects." (R. 460). Dr. Knowlton stated that Hanson had currently "very few" seizures per month "at the most" and that his last seizure had occurred in July, 2009. (R. 460). Dr. Knowlton wrote that Hanson was compliant with his medication and took "Keppra - so far (few months only) nearly all seizures stopped but very poorly tolerated." (R. 461). Dr. Knowlton wrote that Hanson suffered "profound depression" as a side effect of taking Keppra, and he listed "depression" as an "associated mental problem." (R. 462). Further, in response to a question about the degree to which Hanson's seizure's interfered with his daily activities, Dr. Knowlton opined that "adverse effects of best medicine have been disabling depression." (R. 461).

The ALJ acknowledged that Hanson suffered depression as a side effect of taking Keppra (R. 17), but the ALJ rejected Hanson's allegations regarding the severity of his depression. The ALJ found that the record contained "no evidence of

10

any mental disorder other than that which might be attributed to the side effects of medication and any such side effects are also indicated to be not severe as they relate to the claimant's mental functioning," and the ALJ found that "the record fails to support more than minimal restrictions" from depression.  (R. 17-18).

To reach the conclusion that there was "no evidence" of "any more than mild depression" (R. 17), the ALJ rejected (among other evidence) Hanson's treating physician's opinion that his depression is "profound" and that it significantly limits his ability to do basic work activities.  *See Thomas*, 540 U.S. at 24 (defining "severe impairment").  An ALJ must give substantial weight to the opinion of a treating physician unless "good cause" is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  "'Good cause' exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.*  When the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons for doing so, and those reasons must be substantially supported by the evidence.  *See id.*

In this case, the ALJ rejected Dr. Knowlton's opinion after concluding that it was inconsistent with the record and not bolstered by the evidence.  (R. 17-18, 19-20).  In reaching this conclusion, the ALJ relied heavily on his observation that "[t]he

claimant alleges disability since July 2008, but did not report any depression or any particular mental symptoms . . . when he filed for disability in January 2009." (R. 16). The ALJ also noted that, in a March 2009 function report, Hanson reported "a wide range of activities" that were inconsistent with his allegation of disabling depression. (R. 16). Of course, events occurring in January 2009 and March 2009 preceded events taking place on or after July 1, 2009, the date on which Hanson began taking Keppra, the medication which Dr. Knowlton concluded was causing his "profound" depression.[7] There is no inconsistency between Hanson's initial disability application materials and Hanson's later, more current reports and testimony, confirmed by Dr. Knowlton's medical opinion, that Keppra is causing profound depression. (R. 16, 18).

The ALJ also opined that Hanson's reported symptoms of depression in July 2009 are not consistent with anything "more than mild depression" that is so slight or trivial that it cannot constitute a severe impairment. *See McDaniel*, 800 F.2d at 1031 (holding that an impairment can be considered as "not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work" and that only "claims based on the most trivial impairment to be rejected"). However, on their face, the depression

---

[7]In other words, the ALJ's conclusion would make sense only if time did not exist. Obviously the ALJ is not aware of Einstein's observation that time exists so that everything doesn't happen at once.

symptoms Hanson reported are not "so slight" or "so minimal that [they] would clearly not be expected" to cause more than trivial interference with his ability to work. *McDaniel*, 800 F.2d at 1031 (defining "severe impairment"); (R. 357-58 (Hanson's subjectively-reported symptoms including loss of appetite, feeling depressed and "unable to shake the blues," talking less than usual, being bothered by things that did not usually bother him, and feeling unable to "get going").

Moreover, the ALJ commits error when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians. *Wind v. Barnhart*, 133 Fed. Appx. 684, 691 (11th Cir. 2005); *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir.1986). Here, Hanson's treating neurologist evaluated his condition after he had been on Keppra for several months and concluded that, *at that time*, Hanson's depression was "profound" and sufficiently severe to interfere with his ability to work. (R. 461). The ALJ rejected this opinion based on his own independent review of Hanson's self-reported symptoms from July 2009, only a week after he began taking Keppra. For instance, the ALJ opined that Hanson's July 2009 responses to the Center for Epidemiology Depression Scale (CES-D) (R. 357) indicated "[no]thing more than mild depression." (R. 17). However, the CES-D is a diagnostic "tool . . . for identifying depression" used by "[e]xperts who treat and study depression . . . to determine a person's level of depression." (R. 357) The ALJ is not qualified nor

13

authorized to grade or interpret the results of Hanson's CES-D. The ALJ made no effort to consider Hanson's treating physician's grading or interpretation of the CES-D. Nevertheless, based on his own interpretation of Hanson's self-reported symptoms, the ALJ substituted his own lay opinion for that of Dr. Knowlton regarding the severity of Hanson's depression. In doing so, the ALJ erred as a matter of law. *Graham*, 786 F.2d at 1115 (holding that "ALJ improperly substituted his conclusion . . . for the medical evidence presented").

Accordingly, substantial evidence does not support any of the ALJ's stated reasons for assigning little weight to Dr. Knowlton's opinion regarding the severity of Hanson's depression, and the ALJ erred as a matter of law in rejecting that opinion. *See Phillips*, 357 F.3d at 1240-41 (holding that substantial evidence must support the ALJ's stated reasons for assigning little weight to the opinion of a treating physician). Therefore, the ALJ's conclusion that Hanson's depression is not a "severe impairment" is not supported by the record and is legal error. *See McDaniel*, 800 F.2d at 1031 (holding that an impairment is "not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work").

**C.    The ALJ committed reversible error at steps three four and five of the sequential evaluation process by failing to consider all of Hanson's impairments.**

"The finding of any severe impairment . . . is enough to satisfy the requirement

14

at step two" of the sequential evaluation process. *Jamison v. Bowen*, 814 F. 2d 585, 588 (11th Cir. 1987); *see also Heatly v. Comm'r of Soc. Sec.*, 382 Fed. Appx. 823, 825 (11th Cir. 2010) (panel decision) ("Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe."). Here, the ALJ credited Hanson with severe impairments (other than depression) at step two and proceeded forward with the sequential evaluation. Thus, the failure to recognize Hanson's depression as a severe impairment constitutes reversible error only if the ALJ failed in subsequent steps of his analysis to fully account for functional limitations arising from that impairment. *See Heatly*, 382 Fed.Appx. 823; *see also Burgin v. Comm'r of Social Sec.*, 420 Fed. Appx. 901, 903 (11th Cir. 2011) (panel decision) ("Even assuming the ALJ erred when he concluded [the claimant's] edema, sleep apnea, and obesity were not severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process."); *Delia v. Comm'r of Social Sec.*, 433 Fed. Appx. 885, 887 (11th Cir. 2011) (panel decision) ("Because the ALJ gave full consideration to the consequences of [the claimant's] mental impairments on his ability to work at later stages of the analysis, the error [in failing to identify the claimant's mental impairments as a severe disability] at step two was harmless and is not cause for reversal.").

Here, the ALJ did not properly consider or account for Hanson's depression at subsequent steps of the sequential evaluation process. At step three of the evaluation process, in determining whether Hanson's impairment met medical listings for depression, the ALJ expressly incorporated his erroneous step two analysis regarding the severity of Hanson's depression. (R. 17). Thus, the ALJ erred at step three by failing to properly consider Hanson's "medical condition taken as a whole." *Jamison*, 814 F. 2d at 588 (holding that, at step three of the evaluation process, the ALJ must "consider the applicant's medical condition taken as a whole."). Further, the ALJ did not properly analyze the severity of Hanson's depression in accordance with the psychiatric review technique set forth in 20 C.F.R. § 404.1520a for "evaluating the severity of mental impairments . . . when Part A of the listing of Impairments is used." 20 § 404.1520a (a); *see Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) ("[W]here a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a [psychiatric review technique form] and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand." ).[8]

---

[8] The court notes that the record does include a psychiatric review technique form completed by Dr. Robert Estock, a medical consultant, who concluded that Hanson did not have any mental medically determinable impairments, including depression, as a side effect of his medications. (R. 281, 293). The ALJ assigned little weight to Dr. Estock's review. (R. 17). Moreover, Dr. Estock's review was completed on May 11, 2009, more than one month before Hanson began taking Keppra. (R. 281).

At steps four and five of the analytical process, the ALJ discounted the severity of Hanson's depression and gave little weight to Dr. Knowlton's opinion for the same legally insufficient and factually unsupported reasons that have already been discussed in Part IV.A. of this opinion. (R. 19-20). At steps four and five, the ALJ also rejected Dr. Knowlton's October 2009 professional diagnosis because the ALJ felt that, if Hanson had been more than mildly depressed in July 2009 after taking Keppra for only a week, his discharge instructions would have reflected a change in medication.[9] (R. 19). The ALJ's substitution of his own lay opinion regarding the advisability of changing Hanson's prescription medications is particularly troubling in this case not only because it amounts to an error of law, *Graham*, 786 F.2d at 1115, but also because the record plainly contradicts the ALJ's lay opinion on this point. The record clearly shows that qualified medical personnel have, to date, been unable to find a prescription regimen that would resolve Hanson's seizures without disabling side effects, and that the treating neurologist has concluded that Keppra is the "best" medicine despite the side effect of disabling depression. (R. 52, 59-61, 64-65, 346, 460-62). Further, Hanson *was* eventually prescribed an antidepressant in October

---

[9]Despite the ALJ's confident reliance on his own lay medical theory that keeping Hanson "on the same doses of medication [in July 2009] . . . would be inconsistent with [Hanson] currently experiencing debilitating side effects of medications" (R. 19), the court is doubtful that the ALJ knows of a more effective prescription treatment regimen that Hanson's treating neurologists have overlooked. He certainly did not offer any helpful suggestions as to how to adjust the prescription regimen to eliminate adverse side effects, and he did not recommend a seizure medication that Hanson has not already tried and that would be as effective as Keppra in stopping the seizures.

2009 around the time Dr. Knowlton concluded that his depression was "profound" (R. 17, 63), and the ALJ is not medically qualified to opine that antidepressants should have been prescribed earlier, after Hanson had been on Keppra for only one week. The record absolutely does not support the ALJ's assumption that the failure to change Hanson's medications in July 2009 proves that Hanson is not "currently experiencing debilitating side effects," including depression. (R. 19); *see Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) ("Absent a good showing of cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary.").

At steps four and five of the sequential evaluation process, having rejected Hanson's contention that he suffered from significant depression as a side effect of Keppra, the ALJ formulated Hanson's residual functional capacity and posed questions to the vocational expert without accounting for the functional limitations of Hanson's depression. *See* 20 C.F.R. 416.945(a)(2)-(3) ("We will consider all of your medically determinable impairments of which we are aware ... when we assess your residual functional capacity... We will assess your residual functional capacity based on all of the relevant medical and other evidence."); *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which

comprises all of the claimant's impairments.").

Thus, the ALJ erred at steps four and five of the sequential evaluation process by failing to consider Hanson's entire medical condition, including his depression. *Jamison*, 814 F. 2d at 588 ("[T]he ALJ must consider the applicant's entire medical condition in determining whether the applicant can return to her past work (step four), and if not, whether the applicant can perform other work available in the national economy (step five).").

For these reasons, the court finds that, at steps three, four, and five of the sequential analysis, the ALJ erred as a matter of law, and the ALJ's conclusions are not supported by substantial evidence. The case is therefore due to be remanded. *See Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.1997) (holding that the Commissioner's decision is subject to reversal if it is not supported by substantial evidence); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (holding that the Commissioner's "failure to apply the correct law . . . mandates reversal").

## V. Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion. Further, it is

**ORDERED** that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 n. 2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after she

receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 n.1 (11th Cir. 2008).

The Court will enter a separate final judgment.

Done this 1st day of July, 2013.

                                      /s/Charles S. Coody
                                CHARLES S. COODY
                                UNITED STATES MAGISTRATE JUDGE